UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DANIEL D. STAHL,

                                        Petitioner,

                                                                9:17-CV-1314
v.                                                              (MAD/TWD)

SUPERINTENDENT,

                                        Respondent.

_____

APPEARANCES:                              OF COUNSEL:

OFFICE OF D.J. AND J.A. CIRANDO           John A. Cirando, Esq.
Counsel for Petitioner
Onondaga Savings Bank
101 South Salina Street
Suite 1010
Syracuse, New York 13202

HON. LETITIA A. JAMES                     Margaret A. Cieprizsz, Esq.
Attorney General for the State of New York   Assistant Attorney General
Counsel for Respondent
28 Liberty Street
New York, New York 10005

**MAE A. D'AGOSTINO**, United States District Judge

<u>**DECISION AND ORDER**</u>

        Daniel D. Stahl ("Stahl" or "Petitioner") filed a petition for a writ of habeas corpus,

pursuant to 28 U.S.C. § 2254, to challenge his 2012 conviction following a nonjury trial of first

degree rape and first degree sexual abuse in Essex County Court (the "trial court").  (Dkt. No. 1

at 1.[1])  Petitioner asserts he is entitled to relief on the following grounds: (1) his defense counsel

rendered ineffective assistance on several bases including failing to disclose his relationship with

---

[1]  Citations to filings refer to the pagination CM/ECF automatically generates.

the presiding judge and failing to introduce certain expert testimony; (2) his right to confront adverse witnesses was violated; (3) he could not have validly waived his right to a jury trial because he was unaware of the "festering acrimony" between the trial judge and defense counsel, which "created an actual bias" against him; (4) his right to be present at his grand jury proceedings was violated; (5) the "prosecutor's lack of fair dealing undermined the integrity of the Grand Jury proceedings"; and (6) the evidence against him was legally insufficient. *Id*. at 7-30; *see also* Dkt. No. 3 at 10-24.  The Superintendent, through the State of New York, (the "State" or "Respondent") opposes Stahl's petition.  (Dkt. Nos. 10, 11.)  For the reasons set forth below, the Court denies Petitioner's request for a writ of habeas corpus in its entirety.

## I.   BACKGROUND

On June 30, 2011, an Essex County, New York grand jury returned an indictment charging Stahl with the following crimes: first degree rape, in violation of N.Y. Pen. Law § 130.35(2); first degree sexual abuse, in violation of N.Y. Pen. Law § 130.65(2); three counts of facilitating a sex offense with a controlled substance, in violation of N.Y. Pen. Law § 130.90; first degree criminal sexual act, in violation of N.Y. Pen. Law § 130.5(2); and second degree facilitating assault, in violation of N.Y. Pen. Law § 120.05(5).  The charges stem from the allegation that Stahl drugged the victim ("CC") with Xanax before proceeding to engage in sexual acts with her while she was physically helpless.

After a nonjury trial, the trial court, Judge Richard B. Meyer, found Stahl guilty of rape in the first degree and sexual abuse in the first degree, acquitted him of the remaining charges, and sentenced him to an aggregate prison term of 12 years to be followed by 10 years of post-release supervision and ordered him to pay restitution and a fine.

II.    **DISCUSSION**

a.    **Standard of Review**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") significantly limits the

power of a federal court to grant habeas relief to a state prisoner under 28 U.S.C. § 2254.  In

discussing this deferential standard, the Second Circuit noted in *Rodriguez v. Miller*, 439 F.3d 68

(2d Cir. 2006), *cert. granted*, *judgment vacated and cases remanded on other grounds by*, 549

U.S. 1163 (2007), that

> a federal court may award habeas corpus relief with respect to a
> claim adjudicated on the merits in state court only if the
> adjudication resulted in an outcome that: (1) was "contrary to, or
> involved an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the United
> States"; or (2) was "based on an unreasonable determination of the
> facts in light of the evidence presented in the State court
> proceeding."

*Id*. at 73 (quoting 28 U.S.C. § 2254(d)) (footnote omitted); *see also DeBerry v. Portuondo*, 403

F. 3d 57, 66 (2d Cir. 2005) (quotation omitted); *Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir.

2003) (quotation omitted).

In providing guidance concerning the application of this test, the Second Circuit has

observed that

> a state court's decision is "contrary to" clearly established federal
> law if it contradicts Supreme Court precedent on the application of
> a legal rule, or addresses a set of facts "materially
> indistinguishable" from a Supreme Court decision but nevertheless
> comes to a different conclusion than the Court did.  [A] state
> court's decision is an "unreasonable application of" clearly
> established federal law if the state court "identifies the correct
> governing legal principle from [the Supreme] Court's decisions but
> unreasonably applies that principle to the facts" of the case before
> it.

*Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007) (internal quotation and citations omitted, brackets in the original); *see also Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir. 2001) (citing *Francis S. v. Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000)).

Significantly, a federal court engaged in habeas review is not charged with determining whether a state court's determination was merely incorrect or erroneous, but instead whether such determination was "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2009); *see also Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001) (citation omitted). Courts have interpreted "objectively unreasonable" in this context to mean that "some increment of incorrectness beyond error" is required for the habeas court to grant the application. *Earley v. Murray*, 451 F.3d 71, 74 (2d Cir. 2006) (quotation omitted).

### b.   Ineffective Assistance of Counsel

#### 1.   *Petitioner's Claims*

As noted above, Petitioner asserts he received ineffective assistance of counsel. The genesis of much of Petitioner's claims center around his allegation that one of his trial attorneys, Brian Barrett ("Barrett"), failed to disclose certain details about his relationship with Judge Meyer. To that end, on January 1, 2010, Michael Scaringe ("Scaringe") was arrested for the crime of rape in the first degree. (Dkt. No. 3 at 7.) According to Petitioner, Scaringe was directed to retain Barrett for his defense at the advice of Judge Meyer. *Id*. Petitioner asserts Judge Meyer and Scaringe had known each other for over 47 years when Scaringe met the 10-year old Judge Meyer at a drugstore owned by Judge Meyer's father. *Id*. In 1966, the two men played in a band together and they enjoyed a friendship over the years. *Id*. at 7-8.

Petitioner claims that, after his arraignment, Judge Meyer asked Barrett about the progress of Scaringe's case. *Id*. at 8. Additionally, Petitioner alleges Judge Meyer asked Barrett

about the case in his chambers during plea negotiations and told Barrett to call him as a witness at Scaringe's trial. *Id.*

On July 10, 2011, Barrett filed a motion to dismiss the indictment because Petitioner was not permitted to testify at the Grand Jury. *Id.* Judge Meyer denied the motion, reasoning that Petitioner did not provide written notice. *Id.*

On September 13, 2011, Barrett discussed the case with co-counsel Kym Rivellini ("Rivellini") and Denis deVlaming ("deVlaming") and discussed his belief that they should pursue a bench trial. *Id.* According to Barrett, a "local jury" would not be receptive to Petitioner's case and that he had a good relationship with Judge Meyer. *Id.* At this time, Barrett did not disclose to co-counsel that Judge Meyer suggested Scaringe retain him or that Judge Meyer was interested in Scaringe's trial. *Id.* Barrett executed a Waiver of Jury Trial on December 6, 2011. *Id.* at 9.

Petitioner asserts that Barrett received a fax message from Judge Meyer containing a case for Barrett to use in preparing a N.Y. C.P.L. § 30.30 Motion on Scaringe's behalf. *Id.* Barrett did not disclose this information to co-counsel. *Id.*

On January 19, 2012, the Scaringe trial commenced but a mistrial was declared. *Id.* at 9. Scaringe thereafter fired Barrett. *Id.*

Petitioner's trial was to commence in February 2012. *Id.* Before the trial, Barrett attempted to take a back-seat in the handling of the case. *Id.* Specifically, he asked not to be the attorney of record and told Judge Meyer that deVlaming was going to take the lead in the trial. *Id.*

According to Petitioner, Barrett noticed a change in Judge Meyer's demeanor at trial. *Id.* Specifically, Judge Meyer denied a N.Y. C.P.L. § 30.30 Motion Barrett filed as untimely despite

that, in a prior case, Barrett submitted a similarly timed motion that Judge Meyer considered. *Id*. In sum, according to Petitioner, Barrett's relationship with Judge Meyer soured after Scaringe fired him.

Moreover, before the trial, Barrett submitted the defense's witness list which contained Oliver Brown, Ph.D. ("Dr. Brown"). Dr. Brown was an expert in toxicology and was prepared to testify that the combination of Xanax and alcohol found in CC's blood would not have affected CC as she indicated. *Id*. at 9-10. Dr. Brown would have opined that, "based on his knowledge of the pharmacology and measure of the drugs involved, it was likely that [] CC experienced a drug-induced absence of memory incident, or 'blankout,' rather than a 'blackout,' and that it was quite possible that CC was a willing participant or even the initiator of whatever physical interactions she may have had with petitioner on January 15, 2010." *Id*. at 10. Ultimately, defense counsel decided not to call Dr. Brown. *Id*.

On March 22, 2014, Petitioner submitted a Motion to Vacate the Judgment pursuant to N.Y. C.P.L. § 440.10. *Id*. In his motion, Petitioner largely reiterated the same allegations related to Judge Meyer's involvement in the Scaringe trial and his relationship with Barrett. *Id*. at 12. Petitioner also asserted his counsel was ineffective for failing to call Dr. Brown at trial. *Id*. The State did not dispute any of the factual claims concerning Judge Meyer and Barrett. *Id*. Judge Meyer denied Petitioner's motion without a hearing and discussed the allegations against him in length. *Id*. On July 21, 2016, the Appellate Division, Third Department ("Third Department") unanimously affirmed Petitioner's judgment of conviction and affirmed Judge Meyer's denial of Petitioner's motion pursuant to N.Y. C.P.L. § 440.10. *See People v. Stahl*, 141 A.D.3d 962 (3rd Dep't 2016).

In his habeas petition, Stahl renews his allegations that he received constitutionally ineffective assistance of counsel.  To that end, he asserts Barrett should have informed him of his relationship with Judge Meyer especially after Scaringe fired Barrett and his relationship with Judge Meyer turned.  Moreover, according to Petitioner, Barrett should have moved to recuse Judge Meyer and should have moved to withdraw his jury trial waiver.  Finally, Petitioner asserts his defense counsels' decision not to call Dr. Brown constituted ineffective assistance.

### 2.    *Legal Standards*

The standard applicable to ineffective assistance of counsel ("IAC") claims is "highly demanding," *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986), and "rigorous," *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001).  To prevail on an IAC claim, a defendant must meet a two-pronged test: (1) he "must show that counsel's performance was deficient," *Strickland v. Washington*, 466 U.S. 668, 687 (1984), so deficient that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," *id*. at 690; and (2) he must show "that the deficient performance prejudiced the defense," *id*. at 687, in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id*. at 694.  "[An] IAC claim must be rejected if the defendant fails to meet either the performance prong or the prejudice prong." *Bennett v. United States*, 663 F.3d 71, 85 (2d Cir. 2011).

*Strickland* instructs a court to "indulge a strong presumption that counsels' conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Strickland*, 466 U.S. at 689 (quoting *Michael v. Louisiana*, 350 U.S. 91, 100–01 (1955)).  The Court recognized in *Strickland* that "there are countless ways to provide effective

assistance in any given case," and that even the "best criminal defense attorneys would not defend a particular client the same way." *Id*. Thus, "strategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id*. at 690.

Further, the AEDPA requires a federal habeas court to give deference to a state court's ruling on claims of ineffective assistance of counsel. *See Harrington v. Richter*, 562 U.S. 86, 101 (2011) (noting, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."). Thus, when ineffective assistance claims are considered under the AEDPA, the reviewing court affords a "doubly" deferential standard regarding the state court opinion. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). In other words, when § 2254(d) applies, "[t]he pivotal question" for the federal habeas court "is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101.

### 3.    *Trial Counsel's Relationship with Judge Meyer*

Couched as an allegation of ineffective assistance of counsel, Petitioner argues that Barrett's relationship with Judge Meyers tainted his ability to make effective decisions regarding trial strategy. With that factual backdrop, Petitioner argues Barrett provided ineffective assistance because he failed to: (1) move for Judge Meyer's recusal; (2) reveal the conflict between he and Judge Meyer; and (3) seek withdrawal of the Waiver of Jury Trial after his relationship with Judge Meyer soured. (Dkt. No. 1 at 22.)

In the first instance, Stahl asks the Court to hold an evidentiary hearing to demonstrate his claims for ineffective assistance of counsel, especially the relationship between Barrett and Judge Meyers. (Dkt No. 3 at 15-18.) The Court finds that a hearing is not required. To that end,

it is not entirely clear what additional evidence Stahl would introduce beyond what he has already presented.  The Court has considered that evidence and finds that there is no reason for additional fact-finding.  In other words, a hearing is not required in this case because the issues can be "resolved by reference to the state court record."  *Sparman v. Edwards*, 154 F.3d 51, 54 (2d Cir. 1998) (per curiam); *see also Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.").[2]

After reviewing the evidence, the Court finds the premise underlying Stahl's claims is on shaky ground.  It strains credulity that Barrett's work representing Scaringe in a completely unrelated criminal proceeding would affect the way he handled Petitioner's case.  The evidence simply does not establish this point.  Rather, as the State demonstrated in its response, there is ample record evidence that Barrett remained an active participant in the litigation even after Scaringe fired him and his relationship with Judge Meyer purportedly turned.  (Dkt. No. 10 at 32.)  For example, he was able to successfully obtain an acquittal of several of the charges against Petitioner.

Furthermore, Judge Meyer's decision on the N.Y. C.P.L. § 440.10 motion belies any contention that he harbored resentment or ill feelings towards Barrett or Petitioner and adequately explains why there was no issue with his continued handling of Barrett's case.  (Dkt. No. 4-1 at 13-46.)  Petitioner contends Judge Meyer's thorough opinion demonstrates his

---

[2]  Moreover, to the extent Stahl argues the trial court erred in denying him a hearing for his CPL § 440.10 motion, that claim is not cognizable on habeas review because "federal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings."  *West v. Uhler*, No. 9:12-CV-01611-JKS, 2014 WL 3895235, at *7 (N.D.N.Y. Aug. 8, 2014) (citing *Word v. Lord*, 648 F.3d 129, 132 (2d Cir. 2011)).

"interest" in the case because he conducted his own "self-serving Fact-Finding." (Dkt. No. 1 at 23, 24.) However, it was incumbent on Judge Meyer to consider Petitioner's claims of bias made in his N.Y. C.P.L. § 440.10 motion and—because the allegations all dealt directly with him—he was axiomatically best suited to address Petitioner's arguments.

The Court further finds Petitioner failed to demonstrate Barrett had an actual conflict of interest. "An actual conflict between a lawyer and his client exists when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." *Armienti v. United States*, 313 F.3d 807, 811 (2d Cir. 2002) (citations and internal quotations omitted). Here, Petitioner's argument is essentially that Barrett was less-than-zealous in his representation of Petitioner after Scaringe fired him. Petitioner did not, however, demonstrate any *competing interest* Barrett had that diverged in any material respect with his.

Nevertheless, even granting the premise that Barrett's relationship with Judge Meyer created a potential conflict, it does not follow that his decisions in this case are constitutionally deficient because Petitioner cannot demonstrate that he suffered prejudice due to the potential conflict. *See Cuyler v. Sullivan*, 446 U.S. 335, 349 (1980) (holding that a habeas petitioner must show "that a conflict of interest actually affected the adequacy of his representation."). As the Third Department concluded, Petitioner has failed to establish that he "would have fared better by proceeding either with a bench trial before a different judge or with a jury trial presided over by this Judge." *Stahl*, 141 A.D.3d at 967. The Third Department's finding that Petitioner failed to establish prejudice to successfully demonstrate his ineffectiveness claim related to Barrett's potential conflict was reasonable.

Additionally, Petitioner's argument that his counsel should have moved for Judge Meyer to recuse himself is meritless.  There is no evidence in the record to support a finding that the state court judge had any personal interest in the case.  *See Tumey v. Ohio*, 273 U.S. 510, 523 (1927).  Nor does the record establish "a deep-seated favoritism or antagonism that would make fair judgment impossible."  *See Liteky v. United States*, 510 U.S. 540, 555 (1994).  There is no rule of federal law—or of New York State law, for that matter—that prohibits a judge from presiding over a case where the defense lawyer also represents or represented one of the judge's social acquaintances.  *See id*. at 562 ("[A] judge's prior judicial experience and contacts need not, and often do not, give rise to reasonable questions concerning impartiality.").  In sum, the evidence Petitioner suggests supports his argument that Judge Meyer was interested in Scaringe's case is not a reasonable basis to seek recusal.  Thus, not only has Petitioner failed to establish his due process rights were violated because Judge Meyer presided over his trial, he also fails to establish his counsel was ineffective for failing to bring a motion to recuse Judge Meyer.

Moreover, the Court agrees with the Third Department that Petitioner's proof "failed to establish that it was an objectively unreasonable strategy to proceed with the bench trial[.]" *Stahl*, 141 A.D.3d at 967 (citations omitted).  Here, Petitioner admits that his trial counsel considered that a local jury may be unfavorable to his case and that it was therefore wise to proceed with a bench trial.  (Dkt. No. 3 at 8.)  This decision, like many other decisions defense counsel makes during representation, is a question of trial strategy and is not one that typically provides grounds for an ineffective assistance of counsel claim.  *See Steele v. United States*, No. 02 CR. 629(JSR), 2005 WL 704868, at *12 (S.D.N.Y. Mar. 29, 2005) (concluding that pursuing a non-jury trial was a matter of trial strategy that deserved deference under *Strickland*) (citing

11

cases).  Likewise, as the Third Department found, Petitioner did not establish that he was

prejudiced by his defense team's decision to proceed with a bench trial and that he would fair

better with a jury trial.  *See Stahl*, 141 A.D.3d at 967.  Accordingly, Petitioner's counsels' failure

to move to withdraw the jury trial waiver is not a basis to find they were constitutionally

ineffective.

### 4.      *Failure to Call Dr. Brown*

Petitioner argues his trial counsel ought to have presented the testimony of Dr. Brown, an

expert witness on toxicology.  According to Petitioner, Dr. Brown's testimony "would have

revealed that the combination of alcohol and Xanax in CC's central nervous system would have

led to a 'blankout' in which CC was possibly a willing participant in sexual activity with

petitioner."  (Dkt. No. 3 at 18.)  Petitioner argues his counsels' decision not to present the

testimony because it might "backfire" was unreasonable because the testimony could have

created reasonable doubt as to whether CC was "physically helpless."  *Id*.

The Third Department rejected Petitioner's argument.  To that end, the Third Department

held:

> Although this expert would have testified to certain potentially
> exculpatory conclusions, defense counsel's assessment that such
> testimony would "backfire[ ]" was not objectively unreasonable.
> According to the expert, he concluded that, at the relevant time, the
> victim had a "diminished . . . ability to appreciate what interactions
> she was involved in."  Given that potentially inculpatory
> conclusion, defendant failed to establish that it was not a legitimate
> strategy for defense counsel to forgo calling that expert witness to
> testify.

*Stahl*, 141 A.D.3d at 967 (citation omitted).

Here, the Court finds the Third Department's conclusion was a reasonable application of

*Strickland*.  Specifically, it is well established that "[t]he decision not to call a particular witness

is typically a question of trial strategy that reviewing courts are ill-suited to second-guess."

*Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005) (citation and internal quotation omitted).

Given the potentially damaging portion of Dr. Brown's testimony, it was reasonable trial strategy

for defense counsel not to call him as a witness.  Accordingly, the Court concludes Petitioner has

failed to demonstrate ineffective assistance of counsel with respect to whether his counsel should

have called Dr. Brown.

      **c.**      **Confrontation Claim**

Stahl contends he was denied his Sixth Amendment right to confront adverse witnesses

because the trial court admitted certain DNA evidence.  Specifically, he argues Laurie

Pasqualino's ("Pasqualino") testimony was objectionable because she relied on information

derived from lab technicians who conducted preliminary work and produced raw data that

Pasqualino then used to form her opinion that certain DNA evidence matched Petitioner's

profile.

During trial, Pasqualino testified she works as a forensic scientist for the New York State

Police Forensic Investigation Center.  (Dkt. No. 4-4 at 304.)  Pasqualino testified that to obtain

DNA evidence the lab performs an "extraction procedure."  *Id*. at 311.  The extraction procedure

is a process of applying a chemical to a DNA sample that causes the cells to break open and

release the DNA.  *Id*.  The DNA is then separated from the other components of the cell that are

not necessary for analysis.  *Id*. at 311-12.  Pasqualino testified that a similar process is applied to

extract DNA from sperm cells.  *Id*. at 312.  After the extraction process, the DNA is quantified to

determine how much is available and then it is amplified into multiple copies.  *Id*. at 312-13.

Pasqualino stated she was assigned to conduct a DNA analysis for items related to this

case.  *Id*. at 314.  She stated she initially received a "biobag" that contained the relevant DNA

evidence. *Id*. at 316-17. According to Pasqualino, the biobag contained DNA samples lab technicians had previously extracted. *Id*. at 319, 321. Pasqualino stated she was not necessarily present during the extraction. *Id*. at 322. She testified the laboratory technicians "perform the entire extraction procedure" including the quantification and amplification. *Id*. at 323. Paqualino noted she relies on the accuracy of the technician's work to render her opinion. *Id*. at 327. Furthermore, she testified that lab analysts run the DNA on a "genetic analyzer" and the data from that instrument is what she uses for her analysis. *Id*. In total, she stated four different people assist in the process to obtain the information required for her opinion. *Id*. at 327-28.

During trial, Stahl's attorneys objected to Pasqualino's testimony because she was relying on information derived from lab technicians and analysts he did not have a chance to cross-examine. *Id*. at 329, 333. Judge Meyer overruled the objection. *Id*. at 330. Thereafter, Petitioner argued in his N.Y. C.P.L. § 440.40 motion and in his appeal to the Third Department that the trial court erred in admitting Pasqualino's testimony over defendant's objection that she relied upon data compiled by lab technicians in the same lab who did not testify at trial. *Stahl*, 141 A.D.3d at 964–65.

The trial court denied Petitioner's claim and the Third Department affirmed. The Third Department found that no testimonial statements from the non-testifying lab technicians and analysts were introduced at trial. *Id*. at 965 (citations omitted). To that end, the Third Department found that

> there is no evidence in the record that any lab technician or analyst who participated in the preliminary processing and testing of this DNA evidence engaged in any data editing, analysis, comparisons or interpretations of the evidence or rendered any opinions regarding whether the data collected from the rape kit matched defendant's DNA profile; likewise, there is no proof that Pasqualino relied upon any such opinions or conclusions drawn by others. Further, the technicians' compilation of objective data was

> not accusatory and did not, without Pasqualino's expert analysis
> and testimony, link defendant to these crimes.

*Id*. at 965-66 (internal citations omitted).  Accordingly, the Third Department concluded that

Petitioner's Sixth Amendment rights were not violated.  *Id*. at 966.

In his habeas petition, Petitioner contends the Third Department erred in its conclusion

and relies principally on *Mendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) and *Bullcoming v.*

*New Mexico*, 564 U.S. 647 (2011).  According to Petitioner, Pasqualino's testimony relied on the

reports of various technician and analysts who performed the DNA extraction, quantification,

and amplification in addition to running the DNA through the genetic analyzer.  (Dkt. No. 3 at

21.)  He asserts "[t]hat type of testing involves human judgment in the editing process, and [he]

was denied his right to confront witnesses against him by not being permitted to cross-examine

those technicians."  *Id*.  After careful consideration, the Court finds Stahl's arguments do not

warrant relief and that the Third Department appropriately found that the introduction of

Pasqualino's testimony and her reports did not violate his Sixth Amendment rights.

The Sixth Amendment to the United States Constitution, applicable to the states through

the Fourteenth, guarantees a criminal defendant "the right . . . to be confronted with the witnesses

against him."  U.S. Const. amend. VI; *see Pointer v. Texas*, 380 U.S. 400, 403 (1965).  In

*Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the Confrontation

Clause prohibits admission at trial of out-of-court testimonial statements against a criminal

defendant unless the declarant is unavailable and the defendant had a prior opportunity to cross-

examine him.  *Crawford*, 541 U.S. at 68.  The Court declined to establish any specific

parameters of what constitutes a "testimonial statement."  *Id*. at 51-52.  More recently, the Court

has noted that "under our precedents, a statement cannot fall within the Confrontation Clause

unless its primary purpose was testimonial." *Ohio v. Clark*, 576 U.S. 237, 245 (2015) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)).

As noted above, Petitioner relies on *Melendez-Diaz* and *Bullcoming* to support his argument, but the circumstances are not the same. *Melendez-Diaz* involved the admission of a report titled "certificates of analysis" confirming the contents of a bag of cocaine and its weight. 557 U.S. at 308. *Bullcoming* was similar in that the Court held that an admission of a lab report containing testimonial certification that Bullcoming's blood-alcohol was above the threshold for aggravated DWI was improper. 564 U.S. at 664. The report in *Bullcoming* closely resembled the "certificates of analysis" in *Melendez–Diaz*: law enforcement had provided evidence to a state laboratory for testing, an analyst had tested the evidence and prepared a certificate attesting to the results, and this certificate was "formalized," as the *Bullcoming* Court put it, "in a signed document" for the purpose of proving the facts it alleged in the context of a criminal proceeding. *Id*. at 664-65.

Here, in contrast, Petitioner attempts to rely on reports from lab technicians and analysts that performed perfunctory preliminary work that Pasqualino then considered when she made her report. None of the work the technicians created was obviously testimonial in nature or accusatory and therefore Stahl had no clear Sixth Amendment right to cross examine those individuals at his trial. As the Second Circuit noted in *Washington v. Griffin*, "the Supreme Court has never held that the Confrontation Clause requires an opportunity to cross examine each lab analyst involved in the process of generating a DNA profile and comparing it with another, nor has it held that uncertified, unsworn notations [by those analysts] are testimonial." 876 F.3d 395, 407 (2d Cir. 2017). The Third Department, therefore, reasonably concluded that Stahl's "right of confrontation was not violated when Pasqualino relied upon and made reference to data

collected by nontestifying lab technicians" *Stahl*, 141 A.D.3d at 966 (citation omitted).

Accordingly, because the state court's decision is not "contrary" to clearly established federal

law, Petitioner's arguments with respect to the Confrontation Clause are not a basis to grant

relief. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

### d.     Jury Trial Waiver

The impetus for Petitioner's claim that he could not have voluntarily waived his right to a

jury trial is that his trial counsel failed to disclose his concurrent representation of Scaringe.

However, Petitioner's argument does not address why his waiver of a jury trial was not knowing,

voluntary, or intelligent.  "It is settled that a criminal defendant may waive his constitutional

right to trial by jury if the waiver is 'knowing, voluntary, and intelligent.'"  *United States v.

Carmenate*, 544 F.3d 105, 107 (2d Cir. 2008) (quoting *Marone v. United States*, 10 F.3d 65 67

(2d Cir. 1993)).  At best, Petitioner's argument is that he should have attempted to withdraw his

waiver after he discovered new information that could have been relevant to the merits of his

waiver.[3]

However, as the Third Department concluded, Petitioner's "waiver of his right to a jury

trial [was] no less knowing, voluntary or intelligent even if counsel failed to disclose the

particularities of the Judge's alleged preference for local counsel prior to the waiver's

execution." *Stahl*, 141 A.D.3d at 967.  The Third Department similarly found that "the waiver is

not invalid based on the fact that defendant was unable to predict that, after he waived his right

to a jury trial, the Judge would, in defendant's opinion, eventually develop a less favorable view

---

[3]  As the Court discussed above, Petitioner's attorneys' failure to withdraw his jury waiver after
it was executed did not constitute ineffective assistance of counsel.

of local counsel." *Id*. Petitioner has not established how the Third Department's finding is contrary to federal law. Therefore, this is not a basis for habeas relief.

### e. Petitioner's Presence at the Grand Jury

Petitioner argues he was denied his constitutional right to be present at the grand jury proceedings. (Dkt. No. 3 at 25.) However, as the State appropriately points out, "'a defendant's right to testify before the grand jury is not a federal constitutional right; rather, it is a statutorily created right in New York.'" (Dkt. No. 10 at 48 (quoting *Lucius v. Filion*, 431 F. Supp. 2d 343, 346 (W.D.N.Y. 2006) (other citations omitted)). It is well established that alleged errors of state substantive law are not reviewable in a federal habeas petition pursuant to § 2254. *See Swarthout v. Cook*, 562 U.S. 216 (2011); *Wilson v. Corcoran*, 562 U.S. 1 (2010). Therefore, any perceived error regarding Petitioner's ability to present testimony during the grand jury proceedings is not a basis for habeas relief.

### f. Prosecutorial Misconduct During Grand Jury Proceedings

Petitioner argues the prosecutor did not act fairly during grand jury proceedings because she did not correct CC's testimony regarding whether Petitioner responded to her Facebook messages and that she implied to the grand jury that Xanax was in a wine glass purportedly used by CC, knowing the glass did not contain a trace of the drug. (Dkt. No. 3 at 25-27.) Furthermore, Petitioner argues the prosecutor made two statements during the grand jury proceedings that were improper and deprived him of a fair trial. To wit, the Prosecutor stated that CC had a "high level" of Xanax in her system despite the toxicologist testifying that she did not test the quantity of drugs in CC's system. *Id*. at 27. Further, Petitioner challenges the prosecutor's statement that "the record is clear, [CC] does not remember. She was

unconscious[,]" despite CC only testifying that she could not remember.  *Id.*  The Court finds Petitioner's claims do not warrant habeas relief.

In the first instance, "the verdict of guilty . . . at [Petitioner's] trial necessarily renders any irregularities before the grand jury harmless as it establishes not only that there existed probable cause to indict him, but also that the defendant is 'in fact guilty as charged beyond a reasonable doubt.'"  *Campbell v. Poole*, 555 F. Supp. 2d 345, 367 (W.D.N.Y. 2008) (quoting *United States v. Mechanik*, 475 U.S. 66, 68 (1986) (other citation omitted)).  In addition, the Second Circuit in *Lopez v. Riley*, held that a habeas petitioner's "claims of impropriety before the grand jury in this case concern[ing] the sufficiency of the evidence, a failure to develop exculpatory evidence by the prosecutor, the presentation of prejudicial evidence and error in explaining the law . . . were cured in the trial before the petit jury, which convicted."  865 F.2d 30, 32 (2d Cir. 1989) (internal quotation and citations omitted).  The Second Circuit has stated that, "[d]espite the high place the grand jury holds as an instrument of justice, the social costs of dismissing an indictment because of an imperfect grand jury proceeding are simply too high to accept when the defendant has been convicted after a full and fair trial and no harm has been done."  *United States v. Brito*, 907 F.2d 392, 394 (2d Cir. 1990) (internal citation, alterations, and quotation marks omitted); *see also Bank of Nova Scotia v. United States*, 487 U.S. 250, 255–56 (1988) (expressing the same view).

Thus, because Petitioner was ultimately convicted after a bench trial, his claims of prosecutorial misconduct are not cognizable on habeas review.

Moreover, "for prosecutorial misconduct to require a dismissal of the indictment, the prosecutor's conduct must amount to 'a knowing or reckless misleading of the grand jury as to an essential fact,' or 'systematic and pervasive prosecutorial misconduct as would undermine fundamental fairness.'"  *United States v. Restrepo*, 547 F. App'x 34, 44 (2d Cir. 2013) (summary

order) (internal citations omitted).  Here, the Court has considered the prosecutor's statements and finds that they do not rise to the level of misconduct that would warrant habeas relief.

### g.   Legal Sufficiency of the Evidence

Stahl contends the State failed to establish that the victim, CC, was "physically helpless" and that "sexual intercourse" occurred.  (Dkt. No. 3 at 27-29.)  The Court has reviewed the record in this case and the evidence presented at trial and concludes that his claim lacks merit.

Evidence is sufficient to support a conviction whenever, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  This inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). "[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Parker*, 567 U.S. at 43 (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)).  Indeed, "a state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the 'decision was objectively unreasonable.'" *Parker*, 132 S. Ct. at 2152 (quoting *Cavazos*, 565 U.S. at 2).  Finally, "[§] 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983).

When analyzing sufficiency challenges, "federal courts must look to state law for 'the substantive elements of the criminal offense.'" *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (quoting *Jackson*, 443 U.S. at 324 n.16).  Thus, to sustain Petitioner's conviction of rape in the first degree, the State had to prove he engaged in sexual intercourse with the victim, who was

incapable of consent by reason of being physically helpless.  N.Y. Pen. Law § 130.35(2).

Similarly, to sustain Petitioner's conviction of sexual abuse in the first degree, the State had to

prove that he subjected the victim to sexual contact when the victim was "incapable of consent

by reason of being physically helpless."  N.Y. Pen. Law § 130.65(2).  Petitioner challenges that

the State met its burden to prove the victim was "physically helpless" with respect to both crimes

and that "sexual intercourse" had occurred with respect to the first degree rape crime.

According to New York law, "physically helpless" means that "a person is unconscious

or for any other reason is physically unable to communicate unwillingness to an act."  N.Y. Pen.

Law § 130.00(7).  Here, the evidence was sufficient to satisfy this element.  At trial, the State

introduced evidence that CC was under the influence of Xanax and alcohol—the combination of

which could cause her to become physically helpless.  (Dkt. No. 4-4 at 65.)  Moreover, CC

testified that she had no memory of anything that occurred after arriving at Petitioner's trailer in

the early morning of January 16, 2010.  (Dkt. No. 4-3 at 102.)  Additionally, several witnesses

testified that CC was incoherent the day after the sexual assault.  (Dkt. No. 4-3 at 486-88, 499,

531; Dkt. No. 4-4 at 113-16, 260-61, 266, 278-79.)  Finally, Petitioner's statements regarding

CC's condition during the night of the attack corroborate the conclusion that she was physically

helpless that night.  (Dkt. No. 4-2 at 445; Dkt. No. 4-4 at 149-150.)

With respect to "sexual intercourse," New York law provides that "[s]exual intercourse

has its ordinary meaning and occurs upon any penetration, however slight."  N.Y. Pen. Law

§ 130.00(1).  The evidence at trial sufficiently established penetration occurred.  To that end,

DNA evidence linked to Petitioner was found in the semen on the anal swab of the rape kit and

on CC's tampon string.  (Dkt. No. 4-4 at 374-75.)  Sperm was also detected in CC's cervix.  *Id.*

at 379.  Though the semen found in CC's cervix could not be tested for DNA, the Court

reasonably concluded the semen was Petitioner's given the presence of his sperm elsewhere on CC's body.  Moreover, nurse Sabrina Paine—the nurse who examined CC the day after the assault—testified that there was potential evidence of penetration when she examined CC's labia.  (Dkt. No. 4-3 at 515 (noting an area of redness she characterized as "not normal").)

In light of the evidence, the Court, like the Third Department, finds no reason to disturb the rape and sexual abuse convictions and rejects Petitioner's contention that the State did not meet its burden of proving that the victim was physically helpless or that sexual intercourse occurred.  *Stahl*, 141 A.D.3d at 964-65.

## III.   CERTIFICATE OF APPEALABILITY

28 U.S.C. § 2253(c)(1) provides that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court[.]"  28 U.S.C. § 2553(c)(1).  A court may only issue a Certificate of Appealability "if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2553(c)(2).

Since Petitioner has failed to make such a showing with regard to any of his claims, the Court declines to issue a Certificate of Appealability in this matter.  *See Hohn v. United States*, 524 U.S. 236, 239-40 (1998) (quotation omitted).

## IV.   CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein the Court hereby

**ORDERS** that the petition for a writ of habeas corpus (Dkt. No. 1) is **DENIED and DISMISSED**; and the Court further

**ORDERS** that no Certificate of Appealability shall be issued with respect to any of Petitioner's claims; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Respondent's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of the Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Dated: March 25, 2021
      Albany, New York

Mae A. D'Agostino
U.S. District Judge